Good morning, Your Honors. My name is Eric Martin. I'm representing Jinxue Liu in the case of Liu v. Garland. May it please the Court. The government claims that Mr. Liu's testimony lacked candor, consistency, and plausibility, but there is no basis for these findings in the records, and this should compel this Court to overrule the IJ's credibility determination. For candor, the government points to visa fraud that Mr. Liu used in order to escape from China. There's a bright-line rule against using this type of evidence. But the agency in this case said that it was so many years after the alleged persecution and that that was a factor that mitigates him. Plus, he had gone back to China from Singapore, and so therefore, given that, the bright-line rule you're referring to isn't applicable as a bright-line rule. Well, we would disagree with that. The time that he spent in China was from, the first part was from like 1990, from the time that he was attacked, to about 2000, 2001, when he started trying to get out of China, get to the United States, actually. That period of time, it was hard for anybody to get out of China. I would hope that the Court would take some kind of notice of that. When I was young, that was a well-known fact, that it was hard to get out of a communist country like that. About 2000, he started, he tried to get six, on six separate occasions, he tried to get out of China to get a visa. He did visa applications, and so he was trying to get out of China at that point. It was impossible for him to. As far as going to Singapore, he spent 40 days in Singapore, and then he got sick, and so he had to come back. Singapore is not the kind of place that you can kind of stick around and be an illegal alien for the rest of your life, and I don't think they have much of a... I think the agency said that he left Singapore because he didn't like the climate. Right. He said he was sick because, he got sick all the time because he didn't like the climate. He didn't like it, but I mean, he testified that he got sick, and so he had to leave Singapore. I don't think he had any kind of, there's no evidence to see anything beyond a temporary work permit in Singapore anyway, so I don't think he had any kind of an opportunity to stay there for longer than he might have. I don't know how much longer he could have stayed there legally anyway. To continue, for inconsistencies, the government contends that Mr. Liu testified that he experienced no consequences related to the birth of his first child. I don't think that's an accurate reading of the record. I think at one point he said that he didn't have much problem with that. That was the first time that his first child, when he was just underage, he was involved in an underage marriage, and that was why they were after him. He says that he didn't experience much problem, and then he goes on to talk about his wife's next child, and he'd gotten hit in the head with a brick. They tried to forcefully sterilize him, so I think when he's talking about how much problem, it's like compared to getting hit in the head with a brick and forced to. Isn't this just a situation where there's kind of, I mean, these are good arguments for a trier of fact, but we have a substantial evidence standard of review, and is this a situation where the record compels that we have to agree with your assessment of the evidence? Well, I think it is, because there's ambiguity there, and you shouldn't base an adverse credibility determination on ambiguous statements like that. At another point, he says that he had a lot of problems. He couldn't get his child immunized, and he couldn't get jobs. He had his other, his next birth, so he doesn't, he's, what he does is he says, I didn't have as much, I didn't have, in my opinion, what he's saying is, I didn't have as much problem as, you know, the next time my wife got pregnant, and then later on during cross, he forgets about a fine that he had. The rest of the time he's talking, he says several things that are kind of negative consequences for his first birth. So I think, I think that the, I think that they're misreading the record on that, and the next thing he talks about, his loss of potency. That, it doesn't, I think that there's, I mean, there's evidence in the record that he, that he wasn't, that this was kind of a mistake that the translator made or something like that. He doesn't, let's see, he's talking about, where it happens in his statement is, the second to the last paragraph, he's talking about what happened to him in the hospital at that point of time. The immigration judge says, well, he wrote this when he was in America, so he must, he should have been speaking in the past tense, and again, I believe that's a translation problem. I noticed the problem with my brief was that I cited to a bunch of second, second circuit cases for the translation issue. During prep for this, I noticed that the government cited to Cower v. Gonzalez, and at 1065, at page 1065, there are several Ninth Circuit cases that discuss mistranslation and how, you know, a mistranslation should not be used as a basis for adverse credibility determination. The third issue is implausibility, and this is about whether, when he goes to get, he's taken to get a forced sterilization procedure performed on him, the judge seems to think that his friend goes to bribe the doctor into giving him a botched operation so that he can retain his, I guess potency is the word we're using. So he's taken in the morning, he's taken like, say 10 o'clock in the morning, it doesn't say what time, and he says he gets home at 8, and he says that the procedure happened at 7 o'clock. And the judge seems to think that it's impossible for his friend to have talked to his wife and gotten to the clinic after making a mistake and going to the hospital. But we're talking about 10 or 12 hours, I don't, and an indeterminate amount of space. We don't know how far it is from the hospital to the clinic that they're talking about, so I don't see the implausibility there. It seems totally plausible to me that his friend could get from his house to the hospital and then to the clinic within the 10 hours between when he's taken and when he supposedly had this operation. The other, so, okay, I'd like to reserve the rest of my time. All right. Thank you, Counsel. We'll hear next from Ms. Pino. Good morning, Your Honors. May it please the court, Tatiana Pino for the Attorney General. The court should deny this petition for review because this court must accept the agency's dispositive adverse credibility determination as conclusive and can reverse only if it finds that every other immigration judge in the United States who reviewed the same evidence in the totality of the circumstances and observed Petitioner testify would have found him to be credible. By virtue of their expertise and ability to directly observe the Petitioner, immigration judges are uniquely qualified to discern their credibility. Indeed, this court has held that only the most extraordinary circumstances will suffice to overturn an agency's adverse credibility determination, and none exist here. Here, the agency provided numerous specific and cogent reasons for why considering the totality of the circumstances and all relevant evidence, Petitioner's claims were not credible. The agency reasonably found that although he repeatedly swore under oath that his testimony and the documentary evidence were true and complete, he attempted to mislead the immigration judge during proceedings, just like he misled other U.S. immigration authorities when he admittedly lied to successfully obtain his last tourist visa to come to the United States. But his explanation for that is that he was lying in order to escape conditions in China, and now case law has said that that's an area where there has to be some caution on the part of the agency. Yes, Your Honor. It is true, and the Board recognized that in Akinmare v. INS, the case from 1999, there is that rule that I believe Petitioner characterized as a bright-line rule, that genuine refugees may lie to escape immediate danger and gain entry into the United States because there's a sense of desperation as they're fleeing. However, the agency acknowledged that and found that that is not the circumstance. In Petitioner's circumstances, he was not fleeing immediate danger, and the immigration judge identifies three facts that prove that. The first is that although he claims to have been persecuted in 1990, he waited 11 years to seek his first visa. The second is he continued to live in China for 24 years after the alleged persecution to leave China, and as Judge Collins pointed out, he repeatedly traveled to and from China for work, not to escape, but for work, and he went to Singapore and he went to South Korea. As Judge Collins correctly pointed out, when he claims to have left Singapore after being there for 40 days in 2013, and this is a quote from Petitioner at 187, quote, he was not adapting to the local weather very well. And where did he go? He went back to China. And from there, he went to South Korea for three years. He departed South Korea in 2012. And where did he go? Back to China. He didn't leave China until 2014. So all of that undermined the notion that he is fleeing immediate danger. There is no immediate danger. And under this Court's precedent in Loho v. Mukasey of 2008, this Court held that voluntary returns to home countries support an adverse credibility determination because it, quote, inherently undermines Petitioner's testimony that she experienced past suffering or that she feared returning home. The immigration judge's decision here isn't wholly consistent with that precedent, and the record does not compel reversal of that agency's determination. Turning to the issue of the inconsistency that Petitioner discussed with the Court, contrary to his assessment, there is no ambiguity here as to whether there is an inconsistency. The immigration judge reasonably summarized Petitioner's testimony to be admitting that he did not suffer any consequences at the hands of the family planning office as a result of an unregistered marriage or the birth of his first child. And let's go through Petitioner's exact statements because that's important, and it shows why the immigration judge correctly found he testified as to no consequence. The first that I'm quoting from is from page 166 of the record, Petitioner's on direct testimony in response to whether the birth of his first child before his legal marriage caused any problems. Petitioner replied, it didn't cause much problem. Then again at 173 of the record, Petitioner on cross, in response to whether he, quote, suffered from any consequences for failing to register his first marriage, he replies, quote, at the time, no. Again, at page 174 of the record, he's on cross, responding to whether he had, quote, any issues with the family planning office with regards to his first child. He replies, no, we did not have any issues with the family planning office regarding our first child. And then lastly, at 174, again on cross, he affirms he did not, quote, have any issues with the family planning office until after his second child was born on August 18th, 1990. All of that is properly summarized by the immigration judge as having testified he suffered no consequences as a result of the first child or his unregistered marriage, which directly contradicts his declaration at pages, at page 17, excuse me, at page 317 that says, because our son did not have a birth permission and we did not have a marriage license, the family planning office fined us. So that is a clear direct contradiction. The record does not compel reversal of the agency's findings. Moreover, Petitioner today, like in his brief, continues to raise post hoc assertions that are unsupported by the record. He even said today, in my opinion, this is how the testimony should be read. That is total post hoc assertion by counsel and it's not evidence. Counsel, may I ask a question?  Thank you. I'm just just out of curiosity. I'm wondering if the United States is actually deporting people to China these days. I can't speak as a matter of policy. If there is a policy as to that, I do know that at this moment, as of today, there's no current plans to remove this petitioner. I was just wondering if that was the case. Anyway, thank you.  And I'd like to also touch on this notion of a translation error. This is again another post hoc assertion by counsel. Counsel is merely trying to throw this alleged translation error at the court and see if it sticks. What we do know is that he said in his declaration at 318, quote, I hope my potency can be restored. And we also know that in the record at page 233, there is a translation certification by a paralegal at his attorney's office that says that the paralegal translated his, quote, English language asylum statement to petitioner in Chinese, and he affirmed it was, quote, correct and complete. So this notion that there is a translation error in that statement is unfounded by the record. And in fact, the record substantially supports the immigration judge's reliance on petitioner's exact words. And as the immigration judge reasonably found, this statement, I hope my potency can be restored, was an attempt to misguide the court as to the severity of his alleged vasectomy. And lastly, talking about the implausibility issue, petitioner today says that his testimony was plausible because we're talking about a span of 10 to 12 hours and a certain distance, but that was petitioner's burden to prove at the hearing or before the immigration judge, and he never put forth any of that evidence. The agency's implausibility finding is entirely reasonable, and the immigration judge highlights just one example for why that's true. In petitioner's story, as he was being led by family planning officials taken away, he told his wife, call my friend Mr. Nee. He can help me get out of this. Well, we're talking about an era before cell phones, as the immigration judge points out. There's no text messages available. There's no e-mail. There's no cell phones. Meanwhile, somehow, his wife, I guess a landline, I presume, called Mr. Nee, and Mr. Nee went back and forth to all these various locations, all before the petitioner could arrive at the clinic and have a simple procedure done. The immigration judge looked at this totality of the evidence and found, I just don't quite believe it. And so with that, Your Honors, if there are no further questions, the Respondent would respectfully request that you deny this petition for review. Thank you. Thank you, Counsel. We'll hear rebuttal. Okay. So the government says that this has to be based on the totality of the circumstances, and this is something we agree with. Our position is that the immigration judge didn't ascertain what the totality of the circumstances were. She didn't ask for confirmation on several of the facts that she made her ruling based on, and there were a lot of issues that I think probably should have gone into a court. As for immediate danger, I mean, he is in China. He can be picked up by the Chinese police at any time. These are things that are in the country conditions reports that were submitted. The Chinese police are a very scary group of people. As for going back and forth to China, he was deported once from Korea after spending three years there. That, to me, shows that he did not want to go back to China and that he wanted to spend some time any place outside of China. And, again, as far as Singapore goes, he said he had a work permit, and I think that most of the country – I feel – let's see. The countries around China do not want to be inundated with a bunch of Chinese immigrants, so they have very strict asylum rules. As for Loho, that illustrates what's going on. That was a situation where the woman was going back and forth between the United States and Indonesia. She found out about asylum, and yet she still returned to Indonesia. She didn't pursue her claim when she was here, and then she came back and went back and forth. Mr. Lu went to countries that do not really have an asylum – don't have asylum programs, therefore it's distinguishable. The translation, as counsel said, the paralegal did it, not the translator. A few grammatical errors are to be expected. That's my time. All right. Thank you, counsel. The case just argued will be submitted.
judges: THOMAS, WARDLAW, COLLINS